# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| R.R. DONNELLEY & SONS COMPANY, | ) | |
| doing business as R.R. DONNELLEY | ) | |
| LOGISTICS SERVICES, a Delaware | ) | |
| Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | No.  06 C 5837 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| VANGUARD TRANSPORTATION | ) | |
| SYSTEMS, INC., an Ohio Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

This breach of contract dispute proves the wisdom of Shakespeare's injunction, "Defer no time, delays have dangerous ends." Henry VI, Part 1, Act III, sc. ii 1.33 1 (1592).  The case arose from an admittedly delayed delivery by Vanguard Transportation Systems of advertising brochures announcing a post-Christmas Macy's sale in Florida.  The brochures were delivered to Donnelley's distribution center in Atlanta on December 27, 2005 – eleven days after the promised date of delivery.  By then it was too late to mail the brochures to Macy's customers.  Donnelley had to credit the $81,650 cost of the brochures to its customer, Continental Web Press, the printer of the Macy's brochures.  At the bench trial, Donnelley sought this amount in damages, plus its attorney's fees, which it contends are due under the indemnification clause in the parties' contract.

Vanguard admits the delivery did not occur until December 27, but claims Donnelley caused the problem by refusing to let Vanguard's driver unload the truck, even though he arrived at the distribution center on Friday, December, 2006 before 2:00 p.m., as he was required to do.  It is Vanguard's further contention that Donnelley never told it, either before or after the failed delivery

attempt on December 16, that the load had to be delivered to Donnelley not later than December 21st (or the 23rd, the evidence on this point was not entirely clear) or it would be valueless. Vanguard contends that even if it breached the contract, Donnelley cannot recover because it failed to mitigate its damages. Failure to mitigate is an affirmative defense on which Vanguard has the burden of proof. *Cates v. Morgan Portable Bldg. Corp.,* 780 F.2d 683, 687 (7th Cir.1985).

Donnelley's position is that Vanguard breached the contract by arriving in Atlanta at least two hours late, while outbound trucks were being loaded. While acknowledging that the victim of a breach of contract must mitigate damages, Donnelley argues that it did not do so – although it concedes that it would have been easy and cheap for it to have done so – because it justifiably relied on Vanguard's repeated assurances that it would make delivery.

Stating the parties' respective positions is simple; nothing else in the case is, for the parties disagree over virtually every factual and legal issue in the case. The question that preoccupied the parties at trial was whether Vanguard's driver arrived at 1:45 p.m. on December 16th, as he claimed – and thus arrived on time – or at around 4:00 p.m., as Donnelley's agent claimed, and thus too late for the Vanguard truck to be unloaded. Determining whom to believe was rendered more difficult because the relevant testimony was through depositions, thereby making it impossible to assess the witnesses' demeanor, which often plays a significant role in making credibility determinations. Indeed, the Supreme Court has said that the demeanor of a witness may satisfy the tribunal not only that the witness' testimony is not true but that the truth is the opposite of his story, "for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *N.L.R.B. v. Walton Mfg. Co.,* 369 U.S. 404, 408 (1962). *See*

*also Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 575 (1985); *Thornton v. Snyder,* 428 F.3d 690, 697 (7th Cir.2005), *cert. denied,* 547 U.S. 1192 (2006); *United States v. Wendt,* 465 F.3d 814 (7th Cir.2006).

But credibility involves more than demeanor, and while the opportunity to assess demeanor may be a sufficient basis to accept or reject a witness' testimony, it is not a necessary basis. The implausibility of testimony, the shifting and vacillating explanations for conduct, the inconsistencies between testimony and objective evidence, and the internal inconsistencies within testimony are perhaps more important than attempting to separate truth from a tale spun for the occasion by watching a witness's mannerisms while testifying. *See Mitondo v. Mukasey,* 523 F.3d 784, 788 (7th Cir. 2008)(Easterbrook, C.J.); *United States v. Bradford,* 499 F.3d 910, 920-21 (8th Cir.2007); *Pinpoint, Inc. v. Amazon.Com, Inc.,* 347 F.Supp.2d 579, 583 (N.D.Ill.2004) (Posner, J.)(sitting by designation).

## THE EVIDENCE AT TRIAL [1]

Donnelley is one of the Nation's largest commercial printers (Pl.'s Ex. 6); Vanguard is a for-hire interstate motor carrier. (Pretrial Order, Stipulation of Uncontested Facts, ¶5)("Stipulation"). Anxious to do business with Donnelley, Vanguard, in 2004, represented itself as a successful, service-sensitive, carrier with a "99%+ on time performance record" and daily capacity in numerous states, including Georgia. (*Pl.'s Ex.* 1 at 0107; Pl.'s Ex. 6; Stipulation, ¶9). Vanguard's efforts were successful, and the parties entered into a written agreement, the Truckload Line Haul Services Contract, in November of 2004. (Pl.'s Ex. 8; Stipulation, ¶7). Vanguard signed the Truckload

---

[1] The sections of this opinion captioned EVIDENCE and ANALYSIS constitute the findings of fact and conclusions of law required by Rule 52(a)(1), Federal Rules of Civil Procedure.

Contract and returned it to Donnelley. (Menne Dep., at 12; Pl.'s Ex. 8 at 9).[2] Between October 2004 and December 2005 Vanguard delivered a number of shipments of printed material to Donnelley's distribution centers, including the one in Atlanta. (Stipulation, ¶12).

On about December 15, 2005, Vanguard was engaged to transport a shipment of printed material from Continental Web Press in Walton, Kentucky, to Donnelley's distribution center in Atlanta. Vanguard knew Continental Web Press printed and shipped finished paper products. (Stipulation, ¶¶13-14). The parties agree that the engagement was initiated by a phone call from Marcellino Reyes of Donnelley and Kevin Vest, the Distribution Manager at Continental Web Press. (Reyes Trial Testimony). Reyes testified that on about December 8th he spoke with Jim Fates, a salesman for Macy's regarding shipping the Macy's brochures. They then met with Becky Tibbs of Donnelley and were told by Mr. Fates that the brochures were "a very hot shipment." *Id.* Reyes then contacted Greg Maschinot of Vanguard and asked if Vanguard could deliver a truckload of brochures to Donnelley's distribution center in Atlanta. It is at this point that the parties' respective versions of what happened drastically diverged.

Reyes claimed that he told Maschinot that the load was "very hot," since it contained advertising brochures for a Macy's post-Christmas sale in Florida. Indeed, so urgent was the situation that Reyes claimed he agreed to pay triple the spot rate of $1.55 per mile in the parties' contract for Vanguard to deliver the load to Atlanta. Neither the Donnelley manifest nor any other

---

[2] Donnelley did not sign the Truckload Contract after receiving it from Vanguard, and Vanguard initially argued that the contract was therefore not the governing instrument over this dispute. That argument was effectively abandoned during the defendant's closing argument and in post-trial briefing. (Pl.'s Reply to Defendant's Memorandum in Support of Closing Argument, 1; Def.'s Memorandum in Support of Closing Argument, 1). Moreover, the argument is mistaken as the parties operated under the written contract from the beginning. *See Sullivan v. William A. Randolph, Inc.*, 504 F.3d 665, 668 (7th Cir. 2007).

document in the case supported this claim. Quite the contrary, every document showed that Vanguard was to be paid the normal rate of $1.55 per mile. Neither Ms. Tibbs, Mr. Fates, nor Mr. Vest testified, and thus Reyes' claim that he told Vanguard how urgent the shipment was is uncorroborated. Not a single document in the case would have alerted Vanguard to the exceedingly time-sensitive nature of the load. (Pl.'s Ex. 9, 10, 11, 18, at 0329-30). In short, I find Mr. Reyes' testimony unconvincing.

Maschinot, who testified by deposition, agreed that Vanguard would deliver the load by December 16. The delivery time shown on the manifest was 12:00 p.m., but it was undisputed that the parties had agreed that there was a two-hour window within which delivery could be made and still be timely. Mr. Maschinot contacted Simon Blevins, a Vanguard driver, and had him reschedule a prior delivery so that he could make the trip to Atlanta. Neither Blevins nor Maschinot supported Reyes' claim that he told Maschinot how time-sensitive the load was, and Donnelley's own witnesses, including Reyes, admitted that Mr. Reyes never even informed the Atlanta distribution center that the load was time-sensitive, let alone how time-sensitive it was. No specific appointment was set with the Atlanta distribution center, [3] and Reyes never told Vanguard that if the load was not delivered by a certain date it would be valueless since there would not be enough time to mail the brochures announcing Macy's sale.

Reyes conceded that nothing on the face of the Donnelley manifest reflected that the load was time-sensitive (Pl.'s Exs. 9, 10), and that he made no notation in the Donnelley Freight Management

---

[3] The Donnelley witnesses, Willie Favors and Matthew Janiak, say that a specific appointment should have been made but wasn't (see also Complaint, ¶21 and Amended Answer and Affirmative Defenses to Complaint, ¶21), and the Donnelley manifest specifically noted "Appointment Required." (Pl.'s Exs. 9, 10). Mr. Favors was the manager of the Atlanta distribution center in December 2005.

System to reflect that time-sensitivity. He claimed that he had such notations on his own note pad, but it was never produced either in discovery or at trial.[4] While it was Donnelley policy to make room for "hot" loads whenever they arrived (Favors Dep., at 65), Mr. Reyes failed to alert the Atlanta distribution center by email or otherwise that a "hot load" was being delivered by Vanguard on December 16th. (Favors Dep., at 36-37). Matthew Janiak, Donnelley's Operations/ Transportation Manager in December 2005, testified that Reyes should have done so. Reyes conceded that he did not make any notes of his conversation with Maschinot that would support his claim that he told Mr. Maschinot that the load was "hot" or that he agreed to pay triple the spot rate to ensure that the delivery would be in time for the brochures to be mailed before the sale. And he admitted that Donnelley policy required that notes be made of conversations with carriers – especially conversations of the kind he claimed he had with Vanguard.[5]

In sum, the evidence persuades me that Mr. Reyes' testimony is implausible, and I find that Mr. Reyes did not at any time inform Vanguard that the load it was delivering to the Atlanta distribution center was time-sensitive – let alone that it was as time- sensitive as it turned out to be.[6] I do not credit Mr. Reyes' contention that he agreed to pay Vanguard triple the going rate because the load was so time-sensitive. On the contrary, I find that Mr. Reyes' testimony in this regard is not credible, and he and Mr. Maschinot agreed that Vanguard would be paid at the usual rate of $1.55

_____

[4] Failure to produce evidence that is uniquely available to one party permits the inference that the evidence, if produced, would have been unfavorable. *Graves v. United States*, 150 U.S. 118 (1893); *Miksis v. Howard*, 106 F.3d 754, 763 (7th Cir. 1997).

[5] Mr. Reyes left Donnelley's employ in February 2006, and at the time of his deposition, Mr. Maschinot was no longer working for Vanguard.

[6] Of course, whether the load was hot or not, Vanguard had agreed to deliver it by 2:00 p.m. on December 16, and its failure to have done so – unless otherwise caused by Donnelley – was a breach of contract. It was no less and no more a breach of contract because of the "temperature" of the load.

per mile.

Reyes confirmed the agreement that Vanguard would deliver the load to the Donnelley distribution center in Atlanta on December 16 before 2:00 p.m. by faxing a manifest to Maschinot. (Pl.'s Ex. 10). Mr. Janiak described this document as "the Bible." It contained information regarding the load's origin, cartage rate per mile, delivery location, date, and a place for any special instructions. (Pl.'s Ex. 10; Stipulation of Uncontested Facts, ¶15). There was nothing to alert the Atlanta facility of the urgency of the load. Compounding that omission was Reyes' failure to have made any notation in the Donnelley Freight Management System or otherwise to have notified the Atlanta distribution center.

Simon Blevins was assigned to make the trip from Walton, Kentucky to Atlanta. (Blevins Dep., at 13). Blevins picked up the load on the evening of December 15, 2005 in Walton and drove to Lexington where he took a mandatory sleeping break. (Blevins Dep., at 15-16). Blevins said he left Lexington between 7:30 or 7:45 on the morning of December 16th (Blevins Dep., at 43, 47-48), arriving in Atlanta at 1:45 p.m. (Blevins Dep., at 30, 46). Mr. Blevins' log, which he was required to keep and which he contended was accurate, reflected that he arrived at Donnelley's facility at 1:45 p.m. (Defense Ex. A). Of course, the credibility of the log was dependent on the credibility of its author.

Upon arrival, Blevins went into the receiving area of the facility to check in. Although he insisted that he was there before 2:00 p.m., he said that the person responsible for processing incoming loads – ultimately identified as Ms. Kanika Lemon – told him that he could not unload the trailer, that they would not take the load that day, and that he had "to reschedule." (Blevins Dep., at 26-31). Blevins said that he then called Mr. Maschinot and told him what happened. He thought

the call was made around 2:00 or "maybe a little after." (Blevins Dep., at 11, 23-28, 30). Maschinot said he did not recall talking to Blevins. In a telephone call with Donnelley's tracing department at 13:06, which is 2:06 p.m. Georgia time, Maschinot reported that Blevins was waiting to unload. (Pl.'s Ex. 12).

If, in fact, Blevins had arrived on time and reported that Donnelley had told him he had to reschedule, common experience suggests that Mr. Maschinot would have informed the tracing department of what occurred. Of course, Mr. Blevins may not have called Maschinot until after he talked to the tracing department, but in that event it would have been odd for Maschinot not to have called Reyes or someone else at Donnelley, and reported what happened, if nothing else, to arrange for a redelivery. (Pl.'s Exs. 6, 9-10). But that is not what occurred, and it is a reasonable inference that Mr. Maschinot did not call to complain because he knew from Blevins and through the Qual.com tracking system that Vanguard used (Trial Testimony of Doug Menne, President of Vanguard) that Mr. Blevins arrived late, and prudence dictated that he avoid contact with Donnelley and arrange for the load to be redelivered.

Mr. Reyes claimed that he repeatedly called Maschinot on December 16th to inquire about the status of the load. Being, as he described himself, "proactive," he said he called at 8:00 a.m. and then again at noon. He said he was told by Maschinot during the second call that the truck was waiting to unload. He claimed he again called at 3:00 or 4:00 and was told the truck was unloading or was unloaded, and the driver was getting ready to leave. Why would Reyes have called Mr. Maschinot, who was in Illinois, when he could have instantly accessed Donnelley's Freight Management System to ascertain whether the load had been delivered in Atlanta? And it seems highly unlikely that Maschinot would have lied when he had to know that with a phone call to

Atlanta or with a simple computer query by Reyes his lie would be exposed. Based on the evidence as a whole and on Mr. Reyes' demeanor, I do not credit Mr. Reyes' testimony regarding his repeated phone calls and his claim that he was deceived by Mr. Maschinot.

In any event, it is undisputed that Blevins left the distribution center, drove to a Vanguard lot less than 20 miles away, dropped off the trailer, picked up a new load, and left Atlanta. (Stipulation of Uncontested Facts, ¶20). At his deposition, in December 2007, Mr. Maschinot said he recalled virtually nothing about the incident. He said that the events occurred two years earlier and that since then he had "moved 40,000 loads." (Maschinot Dep., at 5). He did not remember whether Mr. Blevins was late or whether he spoke with him on December 16th. He had some memory of a load running late, but he could not say whether it was the one to Atlanta on the 16th. (Maschinot Dep., at 41 - 54).

On December 28, 2005, while the events were still fresh in his mind, he explained in a letter to Kevin West of Continental Web Press that Donnelley had "refused [the load] initially on the 16th of December." (Pl. Ex. 15 and 15A). Prior to trial, Donnelley objected on hearsay grounds to portions of Mr. Menne's deposition testimony that recounted what he had been told about conversations between Maschinot and individuals at Donnelley and Continental Press. (Pretrial Order, at 3). Those objections are sustained. However, since Donnelley offered Exhibit 15A without restriction, the hearsay rule does not limit my consideration of the letter. Of course, by the time Maschinot wrote it, he had a motive to falsify. *Cf., Tome v. United States*, 513 U.S. 150 (1995); *United States v. McPartlin*, 595 F.2d 1321, 1352 (7th Cir. 1979). Thus, the claim in the letter that Donnelley refused the load, while admissible, is not of much assistance in deciding what really occurred on December 16. But the letter is significant – not for what it says, but for what it doesn't

9

say: the letter does not say that Blevins was on time and that Donnelley wrongfully refused the load, thereby causing the problem. Yet, that is what one would expect Maschinot to have said if Blevins had arrived on time. *See Moylan v. Meadow Club, Inc.*, 979 F.2d 1246, 1249 (7th Cir. 1992)(impeachment by omission).

Similarly, one would have expected Maschinot to have told Reyes the same thing in their telephone conversation on December 27. But as Reyes testified, Maschinot merely said, referring to December 16th, "it was a bad day." I credit this aspect of Mr. Reyes' testimony.[7] It is further substantiated by Mr. Maschinot's deposition testimony, in which he said that although he did not have any specific recollection about the load going to Atlanta on December 16th, he did say that he knew that he had a load running late and that he thought it was the one going to Atlanta, although he could not swear to it. (Maschinot Dep., at 41). As he reviewed documents at his deposition, he said "I remember a load being late," "being delivered late; not getting it delivered. That comes back to me." (*Id.*, at 73). Mr. Maschinot said he was very sorry that this all happened, but he couldn't remember "everything on it," and that none of this would have happened if Donnelley had just taken the load. *Id.*

.        Blevins' version of events was disputed by Ms. Lemon, who said in her deposition that Mr. Blevins arrived at between 4:00 and 4:30 p.m. She was certain, she said, because his arrival coincided with the end of her work day, and because this was the only load in her two-and-a-half years at Donnelley that was late. (Lemon Dep. 54, 57-58, 60, 73). However, Ms. Lemon admitted that she made no notation in her records to indicate when Mr. Blevins actually arrived (Pretrial

---

[7] The doctrine of *falsus in uno, falsus in omnibus,* if it ever had any vitality, has none today, and a court is entitled to accept portions of a witness' testimony and reject others. *Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007).

Order, Stipulation of Uncontested Facts, ¶21), and Mr. Favors said that trucks are late all the time for a variety of reasons. (Favors Dep., at 10, 61). She said that it was Donnelley's policy not to turn a driver away, but to ask him to wait and that is what she did. Ms. Lemon claimed that she was instructed by Mr. Favors to tell the driver to wait (the four or five hours) until the second shift had completed loading the outbounds. (Lemon Dep., at 57-59). She said the Vanguard driver became upset, refused to wait, and left. Donnelley's own evidence at trial and through the depositions of Ms. Lemon and Mr. Favors was that had she just sent the driver away, it would have been a violation of Donnelley policy. (Lemon Dep., at 54, 57-58).

Ms. Lemon said that she knew that it was typical for material being delivered to the Atlanta facility to be time-sensitive. Nonetheless, she admitted that she did not make any effort to determine the expiration date of the contents of the load being delivered. (Lemon Dep., at 78). As Mr. Janiak of Donnelley admitted at trial, Vanguard had never been told the expiration date of the brochures. Mr. Favors, who was not affiliated with Donnelley at the time of his deposition, said that when he was conducting his investigation as to what occurred, he was told by Ms. Lemon that the driver was late and that she told him he could wait, but he chose not to. (Favors Dep., at 54-55). This was his only conversation with Ms. Lemon. (Favors Dep., at 55-56).

Favors said that drivers aren't just going to wait around for hours to unload, because they invariably have other deliveries. (Favors Dep., at 37). He also said that Donnelley allowed drivers to drop their trailers in the yard for later unloading, (Favors' Dep., at 60-61), and that there was equipment at the Atlanta facility that would have enabled a trailer that was dropped off somewhere in the yard to be moved later to one of the 50 doors for unloading. (Favors' Dep., at 53). Ms. Lemon said that she did not recall telling Mr. Blevins he could leave his trailer at a door for later unloading.

(*Id.*, at 58-59). Had she done so, it would have been recorded on the Donnelley internal FMS system, but it was not. Lemon's deposition testimony retreated from her answer to an interrogatory in which she swore she had assigned a door to Blevins, but he had refused her offer. (Lemon Dep., at 61, 65). Consequently, prior to trial, Donnelley stipulated that Mr. Blevins had not been assigned a door to unload the truck. (Pre-trial Order, Stipulation, ¶22).

The evidence arguably admits of several possibilities: First, Mr. Blevins arrived on time, but Ms. Lemon nonetheless refused the load and told him that he would have to "reschedule." This seems a highly doubtful conclusion given the distance from Lexington to Atlanta, Blevins' estimate of his average speed, the existence of stretches where the speed limit was 55mph, thereby causing a reduction in the overall average speed , his having stopped to put gas in his 150 gallon tank (which could have taken 15 minutes, according to Vanguard's President), Mr. Maschinot's evasive deposition testimony, his concession that he recalled a load delivering late and that it could well have been the one to Atlanta on the 16th, the significant omission in his letter of December 28, and the absence of any motivation for Ms. Lemon to have refused a timely delivery.

The second possibility is that Mr. Blevins was on time, but Ms. Lemon told hm he would have to wait to unload. After all, it was the holiday season, and 40-50 loads a day were being handled at one time. (Stipulation of Uncontested Facts, ¶23). Third, Blevins arrived as Lemon was leaving work, and she told him he would have to "reschedule." Fourth, Blevins arrived late (but not as late as Lemon claimed) and was told by her that he would have to wait until the outbounds were unloaded.

Taken as a whole, the conflicting evidence strongly favors the last possibility and I conclude that is what occurred. It cannot be ascertained with certainty how late Mr. Blevins was. But the

ultimate resolution of the case does not hinge on those details. Whether Mr. Blevins was a half hour or two hours late, he was still late. And while I do not credit Ms. Lemon's deposition testimony that all she told Blevins was that he had to wait to unload the truck,[8] the precise words she used ultimately do not matter, for the effect of telling Blevins that he had to wait for the shift change – even if that had occurred – was the functional equivalent of telling him he had to reschedule, since drivers simply will not wait several hours to unload if they have other deliveries. (Favors Dep., at 37). The evidence showed that Mr. Blevins was on a tight schedule and was not going to wait to unload because he had to pick up another load at the Vanguard lot for delivery to another customer in another state. But even if Blevins' story is fully credited, the outcome of the case remains the same, as we shall see.

After the aborted delivery attempt on Friday the 16th, Vanguard and Donnelley were in daily contact to reschedule the delivery. It is unclear whether the Atlanta facility was open on Saturday and could have accepted delivery. But Vanguard could not deliver that day, and so delivery was rescheduled for Monday, December 19th. (Pl.'s Ex. 12). Vanguard reported to Donnelley on the morning of the 19th that it "will attempt delivery today." (Pl.'s Ex. 12 at Bates No. 0146). That did not occur. Nor did it occur until December 27th – too late for the Macy's brochure to have any value.[9] Not one of the several calls between Donnelley and Vanguard from December 19 on even

---

[8] Ms. Lemon's version of events was contradicted in part by Mr. Favors, and her sworn interrogatory answer that she assigned Blevins a door turned out to be untrue. That, coupled with her obvious motive to shade the truth – at the time of her deposition she was still employed by Donnelley – persuades me that her testimony that she did not tell Blevins that he had to "reschedule" is not credible. I credit Mr. Blevins' testimony that that is exactly what Ms. Lemon told him.

[9] The interactions between Donnelley and Vanguard between December 19 and December 23 are discussed *infra* at 18.

hinted at the time-sensitive nature of the load and the urgency of the situation, (Pl.'s Ex. 12), and, while Donnelley knew, it never conveyed that information to Vanguard. (*Id.*; Matthew Janiak Trial Testimony). There was not a single exhibit presented at trial by Donnelley that showed that either before or during the period of December 16 - December 27, Vanguard was alerted to the fact that the load had to be delivered not later than December 21st in order to have any utility at all.

In the post-December 16 calls, Vanguard told Donnelley variously that it would "attempt" to deliver the load, that it was having difficulty getting a driver, and that its computers were down. Nonetheless, even as the last day approached on which the brochures had to be received by Donnelley in order to be mailed in time for the Macy's sale, Donnelley did nothing to mitigate its damages. And it remained inert even though, as the evidence showed and Donnelley's post-trial briefing conceded (indeed emphasized), neither cost nor effort would have been required for Donnelley to have mitigated all its damages. .

Donnelley contracted to and paid vanguard $751.35 in cartage costs. (Pl.'s Ex. 18). The production cost of the Macy's brochures was $81,650.00, which Continental Web Press issued as a credit to Macy's as a consequence of the late delivery of the brochures. (Pl.'s Ex. 14). Donnelley was able to obtain a credit on the pre-paid postage for the brochures (Pl's Br. at 8) and satisfied Continental's claim for reimbursement for $81,650.00. (Pl.'s Ex. 14). Donnelley filed a claim with Vanguard in the amount of $83,927.44 on September 1, 2006. Vanguard denied the claim on September 12, 2006. (Stipulation of Uncontested Facts, ¶¶26-28). This suit followed.

## II
## ANALYSIS
### A.

Donnelley knew, but never told Vanguard, that the load it was hauling to Atlanta was so

"hot" that it had to be delivered by December 21st or it would be valueless. However, preoccupation with the "temperature" of the load skews analysis, for the threshold question is whether Vanguard delivered the load as it promised to do by 2:00 p.m. The obligation to have done so was independent of the particular time-sensitivity. The preponderance of the evidence demonstrates that Mr. Blevins did not arrive before the agreed upon time of 2:00 p.m. Whether he arrived shortly after 2:00 P.M.(which seems likely) or closer to 4:30 p.m., as Ms. Lemon claimed (which seems highly unlikely, and I do not credit Ms. Lemon's testimony in this regard), does not matter since the parties' contract did not allow Vanguard to perform "with reasonable dispatch." (Pl.'s Ex. 8 at ¶ 2(a)(iii)).

It was a "time is of the essence" term, with which Vanguard had to comply. *See Elda Arnhold and Byzantio, L.L.C. v. Ocean Atlantic Woodland Corp.*, 284 F.3d 693, 699 (7th Cir. 2002). *Compare, Hardin, Rodriguez & Boivin Anesthesiologists Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 636-37 (7th Cir.1992)("the failure to perform conditions precedent is a bar to substantial performance."). Neither side discusses the concept of immaterial breach as applied to Mr. Blevins' arrival on December 16th and it is, therefore, inappropriate to consider. *See Kay v. Board of Educ. of City of Chicago,* 547 F.3d 736, 738 (7th Cir. 2008); *Hartmann v. Prudential Ins. Co. of America*, 9 F.3d 1207, 1214, (7th Cir.1993); *Weissman v. Weener,* 12 F.3d 84, 86 (7th Cir.1993). And so, Vanguard breached its contract when Mr. Blevins arrived late on Friday, December 16, 2005.

But even if Mr. Blevins' version of events is credited, and Donnelley wrongfully refused delivery, Vanguard's obligation to deliver the load did not end. The contract merely gave Vanguard the option, unless otherwise directed by Donnelley, to drop the load at the nearest Donnelley facility within 48 hours of the refusal by the consignee. (Pl.'s Ex. 8, Tariff 102, Item 850 at "ORIGINAL PAGE" 13-14). Here, coincidentally, Donnelley's Atlanta distribution center was both the consignee

and the nearest Donnelley facility. Vanguard, therefore, was contractually obligated to deliver the load to the distribution center within 48 hours even if Ms. Lemon told Blevins he had to "reschedule" the delivery. Vanguard did not deliver the load until December 27th and hence breached the contract. This then brings us to what Donnelley calls a "red herring," (Reply Brief, at 8), but which is ultimately the critical issue in the case, namely whether Donnelley failed to mitigate its damages, and if so, what are the consequences?

The so-called duty to mitigate damages, which is often referred to as a general contractual duty, *Cates,* 780 F.2d at 687, is a principle of ancient vintage. *See Peck v. Chicago Rys. Co.*, 270 Ill.34, 110 N.E. 414 (Ill. 1915)(*citing Toledo P. & W. Ry. Co. v. Pindar*, 53 Ill. 447 (1870)). Referring to mitigation of damages – or as it is called in tort law "avoidable consequences" – in terms of a "duty" is somewhat misleading, because a plaintiff incurs no liability for failing to act. *See McClelland v. Climax Hosiery Mills*, 252 N.Y. 347, 358, 169 N.E. 605, 614 (1930)(Cardozo, C.J., concurring); *St. George Chicago, Inc. v. George J. Murges & Associates, Ltd.*, 296 Ill.App.3d 285, 293, 695 N.E.2d 503, 509 (1st Dist. 1998); Restatement (Second) of Contracts § 350, Comment b. (1981). Rather, the amount of loss that could reasonably have been avoided by stopping performance or making substitute arrangements is simply subtracted from the amount that would otherwise have been recoverable as damages. *Cates,* 780 F.2d at 687. Phrased differently, the duty to mitigate damages "forbids the victim of a breach of contract, which might well be involuntary, to allow his damages to balloon (when he could easily prevent that from happening), as he might be tempted to do in order to force a lucrative settlement." *Moran Foods, Inc. v. Mid-Atlantic Market Development Co., LLC*, 476 F.3d 436, 440 (7th Cir. 2007)(parenthesis in original).

The victim of the breach must "'exercise reasonable diligence and ordinary care in attempting

to minimize the damages after injury has been inflicted.'" And while he must act with "reasonable dispatch," *Cates*, 780 F.2d at 687, the injured party is not required to take steps that involve "undue risk or burden." *East St. Louis School Dist. No. 189 v. Hayes*, 237 Ill.App.3d 638, 644, 604 N.E.2d 557, 562 (5th Dist. 1992); Restatement (Second) of Contracts § 350 (1981); *St. George Chicago*, 296 Ill.App.3d at 293, 695 N.E.2d at 509. *See also Clarkson v. Wright,* 108 Ill.2d 129, 133, 483 N.E.2d 268, 270 (1985). But there are instances where the victim of the breach might be lulled by the breaching party into inaction because of assurances that all will be well. "[T]o put this differently, the [breaching party] may not insist on mitigation when by its words or deeds it has led the [non-breaching party] to believe that it has assumed what would otherwise be the buyer's burden of mitigation." *Cates*, 780 F.2d at 687.[10] While that is going on, the duty to mitigate is suspended.

Donnelley contends that is what occurred here, although its post-trial briefs do not cite any cases in their abbreviated discussion of mitigation. Donnelley is adamant that it could and would have mitigated its damages by retaining a "local cartage company" to deliver the load if only Vanguard had told the truth about not having a driver to redeliver the load and not having misled it on a daily basis. "Think about what mitigation would have occurred if that had happened," Donnelley laments. (Reply Brief at 8). But Donnelley's claim is unsupportable and is indeed contradicted by not only the evidence at trial, but by the judicial admissions in the Complaint. *See*

---

[10]   This is an application of the broader principle that a party cannot complain about the consequences of his own actions. *Cf. R.H. Stearns Co. v. United States*, 291 U.S. 54, 61-62 (1934) (Cardozo, J.) ("'He who prevents a thing from being done may not avail himself of the non-performance which he has himself occasioned, for the law says to him in effect "this is your own act, and therefore you are not damnified...."'"); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *United States v. Goodwin*, 449 F.3d 766, 772 (7th Cir. 2006)("It is in that sense that he is the author of the delay of which he complains."); *United States v. Cohen*, 145 F.2d 82 (2nd Cir.1944) (L. Hand, J.), *cert. denied,* 323 U.S. 799 (1945) ("It is particularly unreasonable for the accused ... to complain of that confusion of which they were the authors.").

*Help At Home Inc. v. Medical Capital, L.L.C.*, 260 F.3d 748, 753 (7th Cir. 2001)("It is a 'well-settled rule that a party is bound by what it states in its pleadings.'"). Paragraph 31 charges that Donnelley was trying to "persuade" Vanguard to reschedule, but Vanguard was unresponsive, "claim[ing] variously that its computer was down and that it did not have trucks or drivers available to effect delivery."

The evidence shows that by December 20th or December 21st at the latest, Donnelley, could no longer reasonably rely on Vanguard's equivocal statements that it would "attempt" to deliver the load. Accepting Donnelley's theory of the case that Vanguard breached the contract by arriving late on December 16th, Donnelley's duty to mitigate arguably arose at that time. *S.T.S. Transport Service, Inc. v. Volvo White Truck Corp.*, 766 F.2d 1089, 1092 (7th Cir. 1985); *Cates, supra*. Mitigation, which could have consisted of having Mr. Blevins assigned to an unloading bay and leaving his trailer there or somewhere in the lot off to the side (Favors Dep., at 60), would have eliminated the possibility of any damage and would not have involved an "undue risk or burden."

Indeed, that course would, as Mr. Favors' deposition testimony made clear, have been consistent with Donnelley's procedures. However, in December 2005, there were approximately 40 to 50 loads a day be handled by the Atlanta distribution center (Stipulation of Uncontested Facts, ¶23), and the evidence is not clear whether there was an available door on December 16 or space in the yard where Mr. Blevins could have dropped the trailer for later unloading at Donnelley's convenience (Favors' Dep., at 37-38, 60-61). And so it cannot be concluded that Vanguard proved that Donnelley failed to mitigate on Friday, December 16.

Donnelley had the right to assume that Vanguard would redeliver the load within 48 hours by Monday, the 19th as the contract required in the event Vanguard was unable to make delivery on

the 16th. (Pl.'s Ex. 8, Tariff 102, Item 850 at "ORIGINAL PAGE" 13-14). But Donnelley could not indefinitely operate on that assumption or on the further assumption that the load would be delivered by the 21st. There comes a point at which even unequivocal promises by the breaching party – and there were no such promises by Vanguard – cannot be uncritically relied on. Judge Posner made the point in *Cates* with the tale of the host waiting for the late dinner guest: "If you invite someone to dinner, and hours after he was due he still hasn't arrived, you had better infer that he isn't coming, and start eating. You can't let yourself and your other guests starve merely because there is a slight chance that he will show up days later." *Cates*, 780 F.2d at 687. The evidence shows that by either December 20th or the morning of the 21st Donnelley should have inferred that Vanguard wasn't coming and arranged for delivery by other means – an undertaking that Donnelley's post-trial Reply Brief says would have been simplicity itself. *Id.* at 8.

No delivery was made on Saturday the 17th either because Vanguard or Donnelley or perhaps both were closed. (Pl.'s Ex. 12, Bates No. 0147). The contact note from the Donnelley tracing department states that Vanguard was waiting to deliver on Monday the 19th. (Pl.'s Ex. 12, Bates No. 0147). On Monday morning, Vanguard told the Donnelley tracing department that it would "attempt delivery today." *Id.*, Bates No. 0146. When that did not occur, Donnelley might still reasonably have assumed that delivery would be effectuated on the 20th. But on the morning of the 20th, Vanguard informed Donnelley it was waiting for a driver and would have to call back. (Pl.'s Ex. 12, Bates No. 0145). That afternoon, Vanguard told Donnelley that it would not be delivering that day, and the best it could say was that it would "attempt delivery tomorrow." *Id.*, Bates No. 0144. The load did not arrive.

Even when that did not occur, Donnelley was perhaps entitled to wait until Tuesday the 20th.

19

It was not, however, entitled to wait beyond that since the brochures would be of no value unless delivered to Donnelley by Wednesday the 21st. Donnelley has never claimed – nor could it – that it was unaware of the time constraints, and the evidence shows Donnelley never shared that information with Vanguard. By the 20th, it should have been clear to any reasonable and commercially sophisticated person in the industry – and Donnelley was an exceedingly sophisticated consumer of cartage services – that Vanguard's equivocal statement that it would "attempt" delivery on the 21st could not be relied on. On the morning of the 21st – which Mr. Janiak described at trial as the "drop dead" date for delivery – the best Vanguard could say was that it "will attempt delivery this AM." (*Id*. at Bates No. 0143). At 2:23 p.m. that afternoon, Donnelley was told that the load would not be delivered until the 22nd at 1:00 p.m.

Inexplicably, Donnelley did nothing, even though delivery on the 22nd may have been a day late and $81,000 dollars short. Mr. Janiak testified that December 23rd was the last date for the brochures to be in the mail and that the bulk mail center date was December 27th. On the morning of the 22nd, Donnelley knew that there would be no delivery since Vanguard's computer was down –and still did nothing – and on the afternoon of the 23rd, Donnelley was told that the carrier did not have a truck and would not deliver until December 27th. And still, Donnelley did nothing.

Normally "[i]t is a nice question, however, just when the [non-breaching party] should have awakened to the fact that [the breaching party]" can no longer be relied on. *Cates,* 780 F.2d at 687. In most cases, there will be no precise time that can be pointed to that marks when the plaintiff's duty to mitigate can no longer be held in suspension. It is often a guess and "no more than a guess [will be] possible." *Id*. In *Cates*, waiting a month to see if the defendant would make the promised repairs was reasonable. In the instant case, there is no guess work involved, and the precise time

can be pointed to that marks when the plaintiff's duty to mitigate can no longer be held in

suspension. For Donnelley to have allowed December 20th to have passed without having taken

the remedial steps its Reply Brief admits were cheap and easy was unreasonable. To return to Judge

Posner's parable, by December 20th –and surely by the morning of the 21st – Donnelley should have

"infer[red] that [Vanguard] [wa]sn't coming," *Cates*, 780 F.2d at 687, and if it continued to wait for

Vanguard to arrive, the souffle would fall, the candles would go out, and the guests would all be

gone.

The evidence is clear that while Donnelley knew that the "drop dead date" for delivery of the

load was December 21st – the 23rd was also mentioned at the trial however – Vanguard did not.

Indeed, at trial Mr. Janiak conceded that Vanguard was "never notified of the expiration date of the

flyers." Hence, while the parties may have been symmetrically situated in their ability to have taken

appropriate remedial action, they were asymmetrically situated in their knowledge of the urgency of

the situation and hence the need for immediate action.

Donnelley's inaction is mystifying, especially in light of what its post-trial Reply Brief

concedes was the minimal time and effort needed for Donnelley to have eliminated any damage.

As the Reply Brief acknowledges, all that would have been entailed was the minimal cost of renting

a truck from a local cartage company and driving the half hour to the Vanguard lot to pick up the

load and delivering it to the Atlanta facility.[11] Mr. Menne, of Vanguard, estimated that the cost

---

[11] Donnelley's Reply Brief suggests that some steps would have been required to get the load released from Vanguard's lot, but no evidence was presented by Donnelley at trial, and statements by counsel in briefs are not evidence. *See United States v. Stevens*, 500 F.3d 625, 62 -629 (7th Cir. 2007); *Campania Management Co., Inc. v. Rooks, Pitts & Poust*, 290 F.3d 843, 853 (7th Cir. 2002). In any event, these steps, even if necessary, were simple, and the Reply Brief does not suggest they would have posed any, let alone an undue, burden on Donnelley.

would have been about $250. Even if that estimate is low, the cost would have been less than the $750 it cost to haul the load the several hundred miles from Kentucky to Georgia.

The fact that *Vanguard* could have rented another truck or hired a local cartage company does not resolve the question of whether *Donnelley* was required to mitigate its damages by making the alternative arrangements it insists Vanguard should have made. "Contract law seeks to preserve the [the non-breaching party's] incentive to consider a wide range of possible methods of mitigation of damages, by imposing a duty to mitigate even if some of the possibilities are equally within the [breaching party's] power." *Cates*, 780 F.2d at 689. Phrased differently, the breaching party's ability to cure the breach does not excuse the victim of the breach from its duty to mitigate. *Id.*

Beyond pointing out how easy it would have been for Vanguard to have rented a truck from a local company and delivered the brochures, Donnelley's post trial briefs have effectively nothing to say about its own duty to mitigate damages. Its Memorandum of Points and Authorities in Support of Closing Argument does not mention mitigation at all, even though it was an issue in the pretrial order (Contested Issues of Law, ¶H), was a significant issue at trial, and was a prominent feature of Vanguard's closing argument.

The Reply Brief cites not a single case on this issue – even though the defendant's Memorandum in Support of Closing Argument cited *Cates* and *Moran Foods*. It merely emphasized how easy and cheap it would have been for Vanguard to have hired a truck from a local cartage company and delivered the load, and how Donnelley could and would have mitigated its damages if it had only known Vanguard was lying when it promised that it would deliver the load. (Reply, at 6-8). However, as already discussed, Vanguard merely told Donnelley that it would *attempt* to deliver the load, and it was apparent certainly by the morning of the 21st, if not by the afternoon of

the 20th, that it was unlikely that the load would be delivered in time. The specific time-sensitivity of the load and Vanguard's repeated failures to have made good on its "attempts" to deliver it made Donnelley's duty to mitigate all the more obvious and urgent.

To the extent that Donnelley's Reply Brief seeks to argue that the duty of mitigation is excused as a matter of law where it is as easy for a breaching defendant to cure the breach as it is for a non-breaching plaintiff to mitigate its damages – and to the extent that *Cates* does not resolve the issue – the argument is unsupported and undeveloped and thus waived. The Seventh Circuit has "repeatedly made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)." *Accord White Eagle Co-op Ass'n v. Conner*, 553 F.3d 467, 476 n. 6 (7th Cir. 2009)(parenthesis in original); *Fabriko Acquisition Corporation v. Prokos*, 536 F.3d 605, 609 (7th Cir. 2008)("Nor does [movant] present any case law supporting its theory. It is not the job of this court to develop arguments for [parties]."). In any event, the parties were not equivalently situated given Donnelley's superior knowledge about the specific time-sensitivity of the load.[12]

---

[12] Under Donnelley's view of mitigation of damages, it is not difficult to imagine the following exchange between Donnelley and Macy's:

**Donnelley:** It's a real shame about the brochures. The sale was probably ruined.

**Macy's**: It was! What happened?

**Donnelley**: Well Vanguard was a little late on Friday and so one of our people refused the load.

**Macy's**: Why would they have done that?

**Donnelley:** Well it was loading time, of course. Loading time is for loading, unloading time is for unloading.

**Macy's**: Ok, but what about the next few days?

(continued...)

That one cannot rely indefinitely on promises of performance no matter what the accompanying circumstances is a common-sense concept that is not confined to the law of contracts or to questions of mitigation of damages. For example, one who invokes the doctrine of equitable estoppel claiming to have been lulled by statements of a defendant must show that his reliance was reasonable. *Smith v. Potter,* 445 F.3d 1000, 1010 (7th Cir.2006). And even the victim of a fraud has to prove that he *reasonably* believed the misrepresentations and *justifiably* relied on them. *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004); *Hefferman v. Board of Trustees of Illinois Community College Dist. 508*, 310 F.3d 522, 527 (7th Cir. 2002). So, too, the victim of a tort, who must act reasonably under the circumstances known to him. *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 510 (7th Cir. 2009). If you can easily get out of the way of that forklift at work, you can't shut your eyes and hope to take your company for enough money to retire early.

All that stood between Donnelley and the fulfillment of its obligations to Continental Web Press and the complete mitigation of its certain damages of $81,000 was about an hour of either its time or that of a local cartage company and a few hundred dollars. Donnelley chose to do nothing, as it had the right to do. But in law as in life, choices have consequences. The consequence here is that the avoidable loss of more than $80,000 cannot be taxed to Vanguard. *See Vigortone AG*

---

[12](...continued)
**Donnelley:** They didn't deliver. It was one excuse after another. It was really annoying.

**Macy's:** Well you knew the "drop dead date;" why didn't you just pick it up?

**Donnelley:** Why would we do that when it was just as easy for Vanguard to rent a truck and bring it back. Did you expect us to rent a truck and drive the 20 miles to where the trailer was? That might have cost a few hundred dollars. Anyway, it's not our job, it's Vanguard's.

**Macy's:** But you blew our sale and cost yourself $81,000.

**Donnelley:** What's your point? It wasn't our job.

24

*Products, Inc. v. PM AG Products, Inc.*, 316 F.3d 641, 648 (7th Cir. 2002); *Cates,* 780 F.2d at 688-89.

C.

### THE INDEMNIFICATION CLAUSE IN THE CONTRACT DOES NOT ENTITLE DONNELLEY TO RECOUP THE ATTORNEY'S FEES IT INCURRED IN THIS CASE

Under the "American Rule," *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975), and under Illinois law, which governs here (Pl. Ex. 8, ¶ 16), a plaintiff cannot recover attorney's fees incurred in suing the other party to the contract, *Pennsylvania Truck Lines, Inc. v. Solar Equity Corp.,* 882 F.2d 221, 227 (7the Cir. 1989), unless the contract explicitly provides otherwise. *In re Weinschneider*, 395 F.3d 401, 404 (7th Cir. 2005); *Esposito v. Piatrowski*, 223 F.3d 497, 500 (7th Cir. 2000). Donnelley says its contract with Vanguard does, and that it is entitled to be reimbursed for all of its attorney's fees incurred in the instant case pursuant to the following indemnity clause:

> [Vanguard] shall indemnify and hold [Donnelley] harmless from any from any liability, loss, cost, damage or expense, including attorneys' fees, *which may accrue against [Donnelley]* by reason of any liability claims, cargo claims and workers compensation claims *by an entity* that arise out of or are due to acts or failures to act of [Vanguard].

(Pl. Ex. 8, at 2, ¶ 1.C.(ii)) (Emphasis supplied).

As Judge Friendly has explained, the purpose of an indemnity clause is to require the indemnitor to hold the indemnitee harmless from costs in connection with a particular class of claims. Legal fees incurred in defending against an indemnified claim – for example, if Continental Web Press had sued Donnelley because of Vanguard's late delivery – are one such cost and thus fall squarely within the obligation to indemnify and serve to make the indemnitee whole. *See Peter*

25

*Fabrics, Inc. v. S.S. Hermes*, 765 F.2d 306, 316 (2d Cir.1985)(Friendly, J.). This rationale, however, does not apply to legal fees incurred in establishing the existence of an obligation to indemnify – which is what the instant case involves – since such expenses are not by their nature a part of the claim indemnified against. Rather, they are costs incurred in suing for a breach of contract, namely the failure to make good on the indemnification clause. As such, the attorney's fees fall within the American Rule requiring each party to bear its own fees in litigation.

Of course, the parties are free to contract for a different result and to make reimbursable fees incurred in suing to enforce the indemnity agreement. But in Illinois, contractual provisions regarding attorney's fees are strictly construed, and any ambiguity in the contract is strictly construed against the party that wrote it (here Donnelley). *Harter v. Iowa Grain Co.,* 220 F.3d 544, 559 (7th Cir. 2000). The Illinois Supreme Court has emphasized that claims for attorney's fees under an indemnity clause require a careful examination of the clause, and that no useful purpose is served in "attempt[ing] to analyze or reconcile the numerous cases interpreting indemnity clauses. Each depends upon the particular language used and the factual setting of the case. 'The only guidance afforded is found in the accepted rule of interpretation which requires that the agreement be given a fair and reasonable interpretation based upon a consideration of all of its language and provisions.'" *Zadak v. Cannon,* 59 Ill.2d 118, 121, 319 N.E.2d 469, 471-72 (1974).

The indemnity clause in this case allows an award of legal fees and other costs "which may *accrue against [Donnelley]* by reason of any liability claims, cargo claims and workers compensation claims *by an entity* that arise out of or are due to acts or failures to act of [Vanguard]." (Emphasis supplied). The question is whether a suit by Donnelley *against* Vanguard to enforce its claimed right of indemnification for some act or omission of Vanguard was intended to be within

the scope of the clause, or whether it was intended only to cover fees and costs that Donnelley incurs when defending against a third party suit based on some failure of Vanguard. The latter construction is the more natural reading of the clause and the one faithful to the text, which is clearly the language of defense, not prosecution.

Legal fees and other costs incurred by Donnelley in suing Vanguard to enforce the indemnity clause obviously are not fees and costs that have *accrued against Donnelley* because of its defense of a *liability claim, cargo claim or workers compensation claim* brought *by an entity against Donnelley* based on some act or omission of Vanguard. Rather, they arise because of Donnelley's suit to enforce a *contract* claim against Vanguard. Donnelley's contrary construction is arrived at by ignoring the limiting phrases, "liability claims, cargo claims and workers compensation claims" and "which may accrue against [Donnelley]," and by replacing with ellipses the critical words, "by an entity." By the latter device, Donnelley's Reply Brief has artificially rewritten the indemnity clause to make it appear to require indemnification for any loss that may accrue by reason of any claims "... that *arise out of* or are due to any acts or failures to act (of Vanguard).'" (Reply Brief at 9, 11)(Ellipsis, emphasis, and parenthesis in original). But "strategic omissions" cannot change the real meaning of the clause. *Swanson v. Bank of America, N.A.,* 563 F.3d 634, 636 (7th Cir. 2009).[13]

Donnelley's construction of the indemnification clause not only depends on the excision of a critical phrase, but on a failure to read the clause in the informing context of other portions of the paragraph of which it is but one subsection. This sort of approach is contrary to basic principles of

---

[13] Courts have consistently frowned on the practice of deleting relevant provisions from contracts or statutes and replacing them with ellipses. *See e.g., May Dept. Stores Co. v. Federal Ins. Co.,* 305 F.3d 597, 599 (7th Cir. 2002); *United States v. Johnson,* 187 F.3d 1129, 1132 (9th Cir. 1999); Posner, Overcoming Law 277 (1995).

contract construction, which recognize that context is the chief determinant of meaning, *Textrom Lycoming Reciprocating Engine Div., Avco Corp. v. United Automobile, Aerospace, Agricultural Implement Workers of America Intern. Union,* 523 U.S. 653, 657 (1998); *Towne v. Eisner,* 245 U.S. 418, 425 (1918)(Holmes, J.), and which consequently require a court to look at a disputed provision not in isolation but in the setting of the entire contract. *See Great West Casualty Co. v. Mayorga,* 342 F.3d 816, 818 (7th Cir.2003); *Air Line Stewards and Stewardesses Assoc., Local 550, TWU, AFL-CIO v. Trans World Airlines, Inc.,* 713 F.2d 319, 321 (7th Cir.1983). There is, as Justice Cardozo famously said, a "transforming power of association for phrases as for men." *Marchant v. Mead-Morrison Mfg. Co.,* 252 N.Y. 284, 299, 169 N.E. 386 (1929).

The subsection immediately preceding that on which Donnelley relies provides that Vanguard must indemnify Donnelley in every instance where it did not receive the benefit of the insurance Vanguard was required under the parties' contract to provide. That included the reasonable attorney's fees and costs incurred by Donnelley in defending itself. (Pl.'s Ex. 8, at 2, ¶ 1.C.(i)). The subsection goes on to provide that if Vanguard fails to make the required payments to Donnelley, the invoiced amount shall represent an "account stated" on which interest shall accrue at the rate of 10% and that Vanguard shall be obligated in addition to pay all costs and attorneys' fees "*incurred to collect the account stated...,*" not as a matter of indemnification but as a matter of contract. (*Id.,* at ¶ 1.C.(i))(Emphasis supplied).

In the event Vanguard were to fail to pay on its obligations under ¶1.C.(i), and Donnelley sued Vanguard to enforce those obligations, the parties expressly provided that Vanguard would be responsible for attorney's fees incurred in the prosecution of that claim. Paragraph 1.C.(ii), by contrast, contains no such explicit provision, but only requires payment of attorney's fees by

Vanguard in the event "an entity" makes a liability claim, cargo claim or workers compensation claim against Donnelley arising out of some act or omission by Vanguard. Reading these clauses together, as "the universal principle of contract construction" requires, *United States v. Harris,* 473 F.3d 222, 225 (6th Cir. 2006), further reinforces the conclusion that ¶ 1.C.(ii) was not intended to authorize an award of attorney's fees in the event of a suit by Donnelley against Vanguard to enforce the clause.

When sophisticated commercial parties like Donnelley want to include attorney's fees incurred in connection with suits brought by them in enforcing their contracts, they know how to express themselves with clarity – as Donnelley did in ¶ 1.C.(i). *See e.g., Cincinnati Ins. Co. v. Leighton*, 403 F.3d 879, 881 (7th Cir. 2005)(indemnification required "from and against any liability, loss, cost, attorneys' fees, and expenses whatsoever, including the enforcement of this agreement"); *Central Die Casting and Mfg. Co., Inc. v. Tokheim Corp.*, 1998 WL 160900, *8 (N.D.Ill. 1998)(fees incurred in enforcing indemnity provision not caused by "the specific claim indemnified against. Instead, they are costs incurred to sue for breach of contract, or the failure to indemnify."); *Fidelity Mut. Life Ins. Co. v. Harris Trust & Savings Bank*, 1997 WL 308846, *2 (N.D.Ill. 1997)(fees incurred in pursuing indemnification allowed where language "expressly permits . . . recover[y] [of] attorneys' fees and expenses 'incurred in connection with the enforcement of th[e] Agreement'"); *Board of Trustees of University of Illinois v. U.S. Fidelity and Guar. Co.*, 1991 WL 274462, *3 (N.D.Ill. 1991)(contract specifically included "all attorney's fees and costs incurred in bringing an action to enforce the provisions of this indemnity . . . ."); *Eckley v. Lone Star Forge Co.*, 1991 WL 222076, *2 (N.D.Ill. 1991)(noting "the distinction between attorney's fees in defending a third party suit and attorney's fees in enforcing a right to indemnity and thus offer no guidance to the court.").

The indemnity clause in the Donnelley/Vanguard contract is not, as Donnelley contends, congruent with the indemnification clause in *Jackson v. Intertech Resources, Inc.*, 1990 WL 16969, *1 (N.D.Ill. 1990). There, the seller agreed to "indemnify and hold harmless Buyer from and against any and all actions, suits, proceedings, demands, judgments, losses, costs, damages, and expenses (including without limitation, attorney fees and disbursements) resulting from or arising out of: ... (d) any breach of any of the representations or warranties, covenants or agreements of Seller set forth in this Agreement." The plain language of the clause contemplated a suit by one party to the contract against the other in the event of any breach of the agreement and provided for reimbursement of attorney's fees should that occur. The indemnity agreement in this case did not.

Donnelley's attempt to equate the indemnification clause in this case with that in *Schroeder v. C. F. Braun & Co.*, 502 F.2d 235 (7th Cir. 1974) rests on a misreading of the case. The clause provided for complete indemnification for claims "in connection with" the work of the contractor on a construction project.[14] In a one-sentence conclusion, *id.* at 45, the panel held that the clause permitted an indemnitee to recover attorney's fees against an indemnitor in a suit to enforce the indemnification clause. *Schroeder,* Donnelley insists, governs here and requires that Vanguard reimburse it for all fees and costs it has incurred in suing Vanguard to enforce the indemnification clause.

---

[14] "CONTRACTOR assumes entire responsibility and liability for all losses, expenses, damages, demands and claims in connection with or arising out of any injury * * * to persons or property sustained or alleged to have been sustained in connection with or to have arisen out of the performance of the WORK by CONTRACTOR * * * including losses, expenses or damages sustained by F.C.P.C. or OWNER, and herein indemnifies and holds harmless F.C.P.C. and OWNER * * * from any and all such losses, expenses, damages, demands and claims, and agrees to defend any suit or action brought against them, or any of them, based on any such alleged injury or damage, *and pay all damages, costs and expenses, including attorney's fees, in connection therewith or resulting therefrom.*" 502 F.2d at 244-45 (Emphasis supplied).

It is significant that the aspect of the *Schroeder* opinion relied on by Donnelley has never been followed or cited approvingly in any case in the last 35 years. In *Peter Fabrics, Inc. v. S.S. Hermes, supra,* Judge Friendly, speaking for a unanimous panel, concluded that merely including the words "attorneys' fees" among the expenses indemnified against does not automatically result in a shifting of fees in an action to establish the obligation to indemnify. Rather, "these words are more naturally construed as referring to legal expenses incurred in defending against the primary claim. To the extent that *Schroeder*. . . holds to the contrary, it is not supported by the cases relied upon for the result it reaches and we decline to follow it." 765 F.2d at 317, n.3.

Whatever the real meaning of *Schroeder* may be, it does not govern this case. *Schroeder's* terse conclusion pointed to the phrase, "in connection with," as the basis for its expansive reading of the indemnity clause in that case. The Donnelley/Vanguard contract does not contain those words. But more importantly, the scope of the clause in *Schroeder* was unencumbered by the limitations necessarily imposed by the phrases, "which may accrue against [Donnelley]" and "by an entity" that are so prominent a feature of the clause in this case. Those phrases make plain that fees and costs that may accrue against Donnelley stemming from a liability, cargo or workers compensation claim brought by an entity can only accrue where Donnelley is a defendant. Fees accruing from a breach of contract claim by Donnelley against Vanguard are manifestly outside the scope and intent of the indemnity clause. In short, the clause in *Schroeder* is not comparable to the clause here, and this case is not governed by *Schroeder*.

Finally, Donnelley argues that it is entitled to indemnification under Paragraphs 8(A) and (B) of the contract. (Memorandum of Points and Authorities in Support of Closing Argument, at Argument III). Those provisions are part of the paragraph captioned "Indemnification" and require

indemnification of Donnelley for "administrative and other costs of defense, settlement and attorney's fees" where there has been a failure of Vanguard's qualifications or a failure to notify Donnelley in writing of any delay in delivery. Once again, this clause makes clear that the contract contemplated a suit against Donnelley by some third party based on the specified failures by Vanguard, not a suit by it against Vanguard to enforce the indemnification clause. Moreover, there was no failure of Vanguard's qualifications, and Donnelley knew of the non-delivery at least by Saturday, December 17 as evidenced by the repeated contacts between Donnelley and Vanguard. (Pl.'s Ex. 12, Bates No. 0147). Thus, Vanguard's failure to have notified Donnelley in writing, even if a breach of contract, caused no harm to Donnelley and precludes an award of anything but nominal damages. *Conder v. Union Planters Bank, N.A.*, 384 F.3d 397, 400 (7th Cir. 2004); *Kaskel v. Northern Trust Co.*, 328 F.3d 358, 360 (7th Cir. 2003).

The clause also says that indemnification is to be determined under the principles of comparative negligence. Neither Donnelley nor Vanguard has anything to say about this aspect of Paragraph 8, and it would therefore be inappropriate to go any further. *See Kay,* 547 F.3d at 738; *Hartmann*, 9 F.3d at 1214; *Weissman*, 12 F.3d at 86.

## CONCLUSION

For the reasons discussed above, Donnelley is not entitled to damages or to attorney's fees. However, Vanguard did breach the contract and consequently Donnelley would be entitled to nominal damages, *Kaskel*, 328 F.3d at 360, had they been sought. But they were not, *see* Complaint, ¶¶38-41, and *Mindgames, Inc. v. Western Pub. Co., Inc.*, 218 F.3d 652, 654 (7th Cir. 2000) instructs

that under these circumstances judgment should be entered in favor of Vanguard.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 8/12/09